UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

VERTEX DEVELOPMENT, LLC, a Florida
limited liability company,

                Plaintiff,

-vs-                             Case No.  5:07-cv-380-Oc-10GRJ

MARION COUNTY, FLORIDA, a political
subdivision of the State of Florida,

                Defendant.
_____

## **O R D E R**

On September 20, 2007, the Plaintiff, Vertex Development, LLC, ("Vertex"), filed a two-count complaint (Doc. 1) against the Defendant, Marion County, Florida, alleging that the County violated the Federal Telecommunications Act of 1996, 42 U.S.C. § 332, *et seq.*, when it denied Vertex's application for a special use permit to construct a communications tower in Marion County.  Vertex requests relief in the form of a declaratory judgment finding the denial of the permit void, and a mandatory permanent injunction ordering the County to approve the special use permit.

The case is presently before the Court for consideration of Vertex's Motion for Summary Judgment as to all claims (Doc. 13), to which Marion County has filed a timely response.  (Doc. 18).  For the reasons set forth below, the Court finds that Vertex's motion is due to be granted.

It is predictable – and entirely understandable – in every case the Court has encountered under the Federal Telecommunications Act that there will be a group of property owners or nearby residents who oppose the erection of communications towers in their neighborhoods for purely subjective and mostly aesthetic reasons.  It seems that such towers, like prisons, are just not welcome additions to the landscape, and those who hold those sincere opinions are entitled to some sympathy.[1]  This makes for hard cases when they are presented to local political bodies who might find it difficult to explain to their constituents, in an emotionally charged public hearing, the arcane difference between personal preference and substantial evidence.  But the law requires the latter – substantial evidence - - and while the substantial evidence standard is a lenient one (being something less than as preponderance of the evidence), when a tower erector meets all of the objective and reasonably relevant prerequisites established in advance by local authority for the placement of communications towers, the purely subjective preferences of the towers' putative neighbors, not augmented buy any technical or objective facts or evidence, simply do not constitute "substantial evidence" upon which local government can properly rely in denying an application.  Unfortunately, this is such a case, and the Court is required to intervene to grant the Plaintiffs' requested remedy.

---

[1] It is easy to be objective when your own ox is not the one being gored.

## Factual Background

Vertex is a limited liability company located in Tampa, Florida.  Vertex is in the business of providing service to various licensed personal wireless telecommunications providers by locating, leasing, zoning, constructing, and owning personal wireless service facilities.  One of Vertex's clients is T-Mobile USA, Inc. ("T-Mobile"), a provider of cellular telecommunications services.  T-Mobile contracted with Vertex for the purpose of locating a suitable site to place a telecommunications tower in Marion County, Florida, in order to close a service coverage gap.  Vertex located a parcel of land owned by Thomas M. and Barbara A. Gregg (the "Gregg Property") and, on November 1, 2006, Vertex entered into a 30-year Land Lease Agreement for location of a 180 foot monopole telecommunications tower in the southwest corner of the Property.[2]  The anchor tenant for the tower would be T-Mobile, with available space for five additional antennas.

The Gregg Property is located at 551 SW 85th Street, Ocala, Florida, and is zoned A-1 General Agriculture.  The Gregg Property consists of approximately 27.5 acres, was developed as a single-family residence, and has a Rural Land Future Land Use designation under the Marion County Comprehensive Land Use Plan. The Property is located on the north side of SW 85th Street, a private road which runs in an east-west direction.  For the length of the frontage of the Gregg property, the road is physically

---

[2]A monopole tower is defined in § 5.9(g) of the Marion County Land Development Code as a tower consisting of a single pole or spine self supported by a permanent foundation, and constructed without guy wires and ground anchors.  See Doc. 19, p. 12.

located on the Gregg Property.  The Property is abutted on the north, west, and south by A-1 zoned property, also in large acreages.  The A-1 zoned properties to the north and west both consist of some vacant lots and a few developed single-family homes, and the A-1 zoned property to the south is vacant.  The property located to the east of the Gregg Property is zoned R-4 Residential Mixed Use, and contains a developed mobile home park known as Hazel Gardens.  The closest public road right-of-way to the Gregg Property is County Road 475 to the east and SW 80th Street to the north.  Both of these roads are Designated Scenic Roadways.

I.    The Marion County Land Development Code

Entities desirous of constructing and/or operating communications, transmitter, or broadcast towers, as well as any accessory structures, in Marion County must apply for and receive a special use permit.  A "special use" is defined by the Marion County Land Development Code ("Code") as

> a use that would not be appropriate generally or without restriction throughout the particular zoning classification but which, if controlled as to number, area, location, or compatibility with the surrounding area, would not adversely affect the public health, safety, and general welfare.[3]

Section 4.6 of the Code provides that the Marion County Board of County Commissioners (the "Board") is under no obligation to approve a special use permit unless and until the applicant demonstrates: (1) that the proposed use will not adversely affect the

---

[3]See Code § 2.2, Doc. 19, p. 5.

public interest; (2) that the proposed use is consistent with the Comprehensive Plan; and (3) that the proposed use is compatible with land uses in the surrounding area.[4]

Section 4.6 of the Code also sets forth the process for submitting and reviewing special use applications. The application must be writing and contain sufficient information and evidence demonstrating that the application is in compliance with the Code's requirements. The application is first reviewed by the Marion County Planning Department, which will make a written recommendation to the Marion County Zoning Commission (the "Commission"). The Commission will then consider the application and hold a public hearing to discuss the permit, and make additional findings and recommendations to the Board. Upon receipt of the Commission's and Planning Department's recommendations, the Board will hold a public hearing to consider and reach a final decision on the permit.[5]

---

[4]See Doc. 19, p. 6. See also § 5.9(5), Doc. 19, p. 13.

[5]Section 4.6 of the Code also directs the Commission to make written findings and recommendations to the Board concerning various specific requirements, including: (1) provision for ingress and egress to property and proposed structures thereon with particular reference to automotive and pedestrian safety and convenience, traffic flow and control and access in case of fire or catastrophe; (2) provision for off-street parking and loading areas, where required, with particular attention to ... the economic, noise, glare, or odor effects of the Special Use Permit on adjoining properties and properties generally in the surrounding area; (3) provision for refuse and service areas ...; (4) provision for utilities, with reference to locations, availability and compatibility; (5) provision for screening and buffering of dissimilar uses and of adjacent properties where necessary; (6) provision for signs, if any, and exterior lighting with consideration given to glare, traffic safety, economic effects and compatibility and harmony with properties in the surrounding area; (7) provision for required yards and other green space; (8) provision for general compatibility with adjacent properties and other property in the surrounding area; (9) provision for meeting any special requirements required by the site analysis for the particular use involved. See Doc. 19, pp. 7-8.

The Code has also created a separate section for special use permit applications for the placement of telecommunications towers and antennas in unincorporated areas of Marion County.[6]   In addition to the requirements of Section 4.6 of the Code, applicants for a special use permit for telecommunications towers have the burden of demonstrating that the proposed placement of the tower and antennas is, to the extent possible, consistent with the preservation of the aesthetics of the community.[7]

In reaching its decision on permits for telecommunication towers, the Board must consider the following factors: (1) height of the proposed tower; surrounding topography; surrounding tree coverage and foliage; nature of uses on adjacent and nearby properties; proposed ingress and egress; and availability of suitable existing towers and other structures; (2) proximity of the tower to residential structures and residential subdivision boundaries, including the amount of the tower that can be viewed from surrounding residential zones in conjunction with its proximity to the residential zone, mitigating landscaping, existing character of surrounding area, or other visual options proposed by the applicant; (3) proximity of the tower to public and private airports, including the effect of the tower on airport traffic patterns and visual and instrument approaches; and (4) design of the tower, with particular reference to design characteristics that have the effect of  reducing or eliminating visual obtrusiveness, including the extent to which the tower is

---

[6]See § 5.9, Doc. 19, pp. 10-23.

[7]See §§ 5.9.1; 5.9.5; Doc. 19, p. 11.

designed and located to be compatible with the nature and character of other land uses and/or with the environment within which the tower would be located.[8]  The Board also will not permit any new towers unless the applicant demonstrates that no existing tower or antenna support structure can accommodate the applicant's proposed antenna.[9]

In addition to these factors, the Code has established Setback and Locational Requirements for all telecommunication towers.  Tower owners must locate the tower on the property in such a manner that in the event of a collapse, the tower structure and its supporting devices shall be contained within the confines of the property lines of the parent parcel, and the fall radius can be no closer than 25 feet from any property line of the parent parcel.[10]   In addition, any telecommunications tower must be setback the following distances:

- • 150% of tower height from any adjacent or surrounding residential dwellings.

---

[8]§ 5.9.5 (a)-(d); Doc. 19, pp. 13-14.  The Board may waive or reduce the burden of any of these factors if the Board determines that the goals of the Code may be better served otherwise.

[9]§ 5.9.5 (e); Doc. 19, p. 14.  An applicant can satisfy this requirement by providing evidence at the time of the initial application showing one of the following: (1) no existing towers or antenna support structures are located within the geographic area that can meet the applicant's engineering requirements; (2) existing towers or structures are not of sufficient height; (3) existing towers or structures do not have sufficient structural strength to support the proposed antenna and related equipment; (4)  placing the proposed antenna on an existing structure would cause electromagnetic interference with either the proposed antenna, existing antennas, or both; (5) the fees, costs, and/or contractual provisions required by the owner to share an existing tower or structure are unreasonable (costs exceeding new tower development are presumed unreasonable); and (6) there are other limiting factors that render existing towers and structures unsuitable.  Id.

[10]§ 5.9.6 (a)(1); Doc. 19, p. 15.

- 100% of tower height from any adjacent or surrounding residentially zoned land.
- 100% of tower height from any off-site agriculturally zoned land
- 100% of tower height from any public road rights-of-way
- 100% of tower height from Designated Scenic Roadways[11]

## II.   Vertex's Application for a Special Use Pemit

On June 13, 2007, Vertex formally applied to the Marion County Zoning/Development Review Department for a special use permit to construct a 180 foot monopole tower in the southwest corner of the Gregg Property.[12]  In connection with the application, and to satisfy the requirements of Sections 4.6 and 5.9 of the Marion County Land Development Code, Vertex prepared and submitted site plans and location maps specifying the location of the proposed tower, the coverage gap and lack of any adequate towers to close the gap, surrounding structures, right-of-ways, and  zoning designations for the surrounding areas; a survey and legal description of the property; a copy of the Gregg's deed to the Property as well as a copy of the lease between the Greggs and Vertex; a letter of intent of collocation from Verizon Wireless; diagrams signed by a Florida Licensed Engineer showing that the tower would be designed to collapse within a 50 foot

---

[11]§ 5.9(6)(a); Doc. 19, p. 15.  Among other things, the Code further requires that all new monopole towers be constructed to allow collocation of a minimum of two antennas; that tower electrical control equipment facilities be landscaped if they are adjacent to or within 330 feet of a residential subdivision or development; and that all new towers shall not be artificially lighted unless required by the Federal Aviation Administration. § 5.9(6) (b), (d), (e); Doc. 19, pps. 15-16.

[12]See Doc. 13, Exhibit A-1.

fall radius; and an FAA determination of no hazard and tower certification specifying that the proposed tower did not have to be marked or lighted for aviation safety.[13]

Vertex also submitted with its application a photo simulation analysis of the proposed tower demonstrating that the tower would be located in a heavily wooded area, and that only a small portion of the tower would be visible from various vantage points of approximately 600 and 800 feet away, including the closest residentially zoned property.[14] To address the question of whether a tower was necessary in the location Vertex specified, Vertex also attached to its application the Affidavit of Alan Ruiz, Vertex President, who stated that there were no existing towers or alternative structures suitable for T-Mobile's antenna within one mile of the proposed location.[15]  Mr. Ruiz further stated in his Affidavit that the proposed tower would accommodate collocation of additional antennas, that Vertex agreed to allow shared use of the tower, and that Vertex and the Greggs would be jointly and severally liable if the tower was abandoned and not removed in a timely manner.[16]

According to the application and accompanying materials, Vertex proposed to construct the monopole tower in the southwest section of the Gregg Property.  The tower would be setback 808 feet from the northern property line, 182 feet from the southern property line, 803 feet from the western property line, and 182 feet from the western

---

[13]Id., Exhibits A-1 to A-13.

[14]Id., Exhibits A-6 to A-12.

[15]Id., Exhibit A-13, pps. 55-56.

[16]Id.

property line.[17]   The tower would be accessed via SW 85th Street, with the nearest residence approximately 275 feet away.  Vehicular traffic on the access road would be limited to one trip per month per wireless provider.  Vertex further provided that the tower would be landscaped in accordance with the Code's requirements.

On July 18, 2007, the Planning Department issued its formal recommendation that Vertex's application for a special use permit be denied.[18]  The Planning Department based its recommendation on the fact that the proposed special use permit: (a) was not consistent with Section 4.6 of the County's Land Development Code; and (b) was not compatible with the general character of the area.  The Department also made the following findings concerning the special use permit:  (1) it was incompatible with surrounding land uses; (2) it was inconsistent with the Marion County Comprehensive Plan; and (3) it would adversely affect the public interest.  Other than summarizing the facts and documents attached to Vertex's application, the only explanation the Department provided for its recommendation was that the proposed tower location "is closer to the existing residential development to the west and potential residential development on the tracts to the south, which may adversely affect the surrounding properties."[19]

---

[17]These setbacks would also insure that the fall radius for the tower would more than double the 25 foot limit established in the Code.

[18]See Doc. 13, Exhibit A-14, pps. 75-83.

[19]Id., p. 76.

Despite recommending denial, the Planning Department proposed a series of alternative approval conditions: (1) the site shall be developed and operated consistent with the submitted conceptual plan and the conditions as provided in the conditional approval; (2) the maximum height of the proposed tower would be 180 feet; (3) the proposed tower "shall be placed generally in the center of the parent parcel, and not less than 270 feet from any surrounding property boundary;" (4) a 25 foot wide vegetative buffer shall be provided and maintained around the perimeter of the subject property, with an opening in the buffer provided for a driveway, with the opening not greater than the minimum width required to comply with minimum driveway site distances; (5) all vehicles accessing the tower shall use a paved driveway; and (6) construction of the tower shall be completed within two years from the date of approval of the special use permit.[20]  Three of the conditions were already accounted for in Vertex's original application; the only material changes were to require a move of the tower site to a slightly more central spot on the Gregg Property, and to require a 25 foot vegetative buffer.

III.    The Zoning Commission's Recommendation

The Planning Department delivered its recommendation with alternative approval conditions to the Zoning Commission, and on July 30, 2007 the Commission considered Vertex's application at a public meeting.[21]    Vertex was represented at the meeting by

_____

[20]Id., p. 78.

[21]See Transcript of July 30, 2007 Hearing, Doc. 13, Exhibit B.

Laura Lee Westine, Vertex's attorney, as well as Alan Ruiz and Jim Campbell, T-Mobile's radio frequency engineer.  Ms. Westine was the primary speaker on Vertex's behalf, emphasizing to the Commission that the proposed tower met and/or exceeded all of the requirements for such towers set forth in the Code.

Ms. Westine explained that the tower would accommodate up to six antennas and that in addition to T-Mobile, Vertex already had a letter of intent from Verizon and was in discussions with Sprint Wireless.  She further testified that the proposed tower was needed in order to close part of a very large gap in coverage along County Road 475, and that there were no other available existing towers that could be used to close the coverage gap. Ms. Westine also explained that Vertex took into account the fact that the Gregg Property bordered on two Designated Scenic Roadways, and that the proposed tower was set back approximately one-half mile from each roadway - far exceeding Code requirements.  With respect to the property lines of adjoining property, Ms. Westine also assured the Commission that the tower's location complied with and/or exceeded the Code's setback requirements.

Ms. Westine further explained to the Commission that the proposed tower would be built with bendable hinges so that the tower would collapse within a 50 foot radius of its location, and that Vertex would comply with all landscaping requirements.  She also stated that the maximum amount of vehicular traffic to the tower would be one trip per month, per carrier.  Thus, in the event the tower contained the full allotment of six antennas, there would be a maximum of six trips out to the tower per month, by technicians driving small,

12

non-commercial trucks.  Ms. Westine also testified that the original proposed tower would be located inside of dense foliage, thereby providing a camouflage buffer further hiding the tower from plain view.  To construct the tower, Vertex would only need to remove one existing tree, and Vertex would continue to maintain the other existing trees.

Ms. Westine also addressed the Planning Department's recommendation.  First, she discussed the alternative conditions of approval, focusing on the condition that the tower be pushed back 270 feet from each property line.  Using Vertex's photo simulation documents, Ms. Westine explained that the Department's proposed re-location of the tower would move the tower out of the existing foliage buffer and into land that is more sparse, thereby making the tower more visible.  However, Ms. Westine did not state that Vertex was opposed to the Department's relocation condition.  Instead, Ms. Westine merely requested that the condition of approval relating to the access road be changed to require Vertex to videotape the road prior to construction and then return the road to its existing condition upon completion of construction.

With respect to the Department's findings for denial, Ms. Westine reiterated that the proposed tower complied with and exceeded all of the requirements set forth in the Marion County Code, and that based on its compliance with the Code, the proposed tower was compatible with the surrounding area.  Ms. Westine also explained that the tower would not adversely affect the public interest because it would allow 911 emergency services calls to be carried on its antennas.

The Commission next heard from Gwendolyn Wolforth, a resident of Marion County who lives at 755 SW 85th Street, on a 23 acre lot immediately to the west of the Gregg Property.  Ms. Wolforth testified that she was in support of Vertex's tower because it would improve her cell phone service.  Ms. Wolforth stated she has tried four different cell phone providers over the years, and she continues to have only periodic service and problems with dropped calls.  Ms. Wolforth further testified that she personally witnessed Vertex conducting its photo simulation tests on the Gregg Property, and that from her home Ms. Wolforth could barely see the test balloon that Vertex raised to the height of the proposed tower.  Given the extremely dense foliage and tree coverage in the proposed area, Ms. Wolforth believed that the tower would be very difficult to see.  Ms. Wolforth also mentioned that one of her neighbors, Vergery Brown, was no longer opposed to the tower, once Ms. Brown learned that there was no risk of the tower collapsing onto her home.

The Commission next heard from Gordon Reese, who resides at 1055 SW 85th Street.  Mr. Reese opposed the location of the tower, claiming that it would be very noticeable to him, because he drives by the southwest section of the Gregg Property every day.  In Mr. Reese's opinion, the proposed tower would constitute an extremely visible nuisance and create accessibility problems for the technicians maintaining the tower, because the access road is not paved, but rather made only out of lime stone.  Mr. Reese also disagreed with Ms. Wolforth's testimony concerning Vergery Brown.  According to Mr. Reese, Ms. Brown continues to oppose the tower out of fear that the tower could collapse onto her home.

14

Mr. Reese also expressed concerns that the tower would decrease property values, both on his own property and on the future residential homes which may be built on the neighboring vacant lots at some point in the future.  Mr. Reese then refuted Ms. Wolforth's claim of cell phone service - Mr. Reese claimed he has never had any problems with coverage at his home at any time.  Mr. Reese's final concern dealt with the potential that the tower would attract lightning, which could potentially damage nearby structures and homes.  Mr. Reese did not present any expert testimony or documentary evidence to support his contentions.

At the conclusion of Mr. Reese's testimony, the Commission gave Ms. Westine an opportunity to submit rebuttal argument.  She began by once again emphasizing that the proposed tower satisfies all required property setbacks.  Ms. Westine also reiterated that the current proposed location of the tower would shield a large portion of the tower from public view.  If the tower were placed where the Planning Department suggested, however, the tower would be out in the open.  With respect to Mr. Reese's concerns, Ms. Westine confirmed that the tower would be constructed with a lightning or ground ring surrounding it, which would absorb any potential lightning strikes so as not to damage any neighboring property or structures.

Following Ms. Westine's rebuttal, the Commission again heard from Mr. Reese, who stated that his main concern about the proposed tower was access to the area by maintenance vehicles.  Mr. Reese did not want the constant noise and traffic that he believed would be generated by the construction and operation of the tower.  In response

15

to questioning from the Commission, Ms. Westine noted that construction of the tower would take only three weeks, and after that the tower would only require up to a maximum of six visits per month.

At the conclusion of the testimony from Ms. Westine and Mr. Reese, Commission member Greg Lord commented that while he was generally in favor of monopole towers, he was concerned about the condition of the one lane lime stone access road, and whether it could handle the increase in traffic the tower would create.  Commission member Sue Shield Mangram stated that she drives through the area in question every day and she loses cell phone coverage in that area.  Chairman Bart Meadows also expressed concern about the access road and how narrow it is.  In response to the Commission's concerns, Ms. Westine stated that Vertex was willing to restore the access road to its present condition once construction was completed.

After some additional discussion between the Commission members, Ms. Mangram moved to reject the Planning Department's recommendation for denial based on a finding that the proposed tower was consistent and compatible with the Comprehensive Plan.  Ms. Mangram further moved that the alternative condition of maintaining a 25 foot existing vegetative buffer be added, as well as a requirement that Vertex restore the access road to its pre-construction condition.[22]  The motion was seconded, and passed by a vote of four to three.

---

[22]It does not appear that the Commission adopted the alternative condition of the additional 270 foot pushback from all property lines.

IV.    The Board of County Commissioners Decision

On August 21, 2007, the Board of County Commissioners held a public hearing to consider Vertex's special use permit application.[23]  At the hearing, Vertex was represented by Ms. Westine, Vertex President Alan Ruiz, Mr. and Mrs. Gregg, T-Mobile radio frequency engineer Jim Campbell, and Ms. Wolforth.   Ms. Westine began her presentation by explaining that the proposed tower would have sufficient capacity to hold six antennas, and that at least two other wireless carriers were already interested in collocating on the tower. Ms. Westine then reminded the Board that although the Planning Department recommended denial, the Commission recommended approval of the special use permit.

Ms. Westine also testified to the Board that based on the concerns raised at the Commission hearing, Ms. Westine and Vertex representatives met with the Greggs and decided that the access road to the proposed site would be relocated to SW 80th Street, thereby avoiding any need to use the one lane lime stone road on SW 85th Street and, in turn, negating Mr. Reese's prior opposition to the tower site.  Ms. Westine then presented the Board with substantial competent evidence in the form of photo simulations, demonstrating the location and potential visibility of the proposed tower both from the original proposed site, and from the site proposed by the Planning Department in its alternative conditions of approval.  Although Vertex believed that its original site would be less visible and farther from any developed residential areas, Ms. Westine made clear that

---

[23]See Transcript of August 21, 2007 Hearing, Doc. 13, Exhibit C.

17

Vertex was willing to place the monopole tower at either site. Ms. Westine also made clear that regardless of which site the Board approved, Vertex intended to maintain a 25 foot wide vegetative buffer around the tower.

Ms. Westine also presented testimony and substantial documentary evidence concerning the other requirements from the Marion County Code: that the tower would be designed to collapse within a 50 foot radius; that the traffic necessary to maintain the tower would be minimal; that Vertex would also construct a fence around the tower; and that the proposed location exceeded all setback requirements and would be approximately one-half mile from the nearest Scenic Road. Ms. Westine also requested that, in light of the fact that Vertex would no longer access the tower through SW 85th Street, that the alternative approval condition related to the access road be changed to merely require a stabilized access road.

Ms. Westine concluded her initial presentation by addressing the negative findings by the Planning Department. First, she contended that the tower was compatible with the Comprehensive Plan by virtue of Vertex's satisfaction of all requirements promulgated by the Code for the construction of telecommunications towers. According to Ms. Westine, satisfying all such requirements is *per se* evidence that the tower is consistent with the Comprehensive Plan. Ms. Westine also challenged the Planning Department's contention

that the tower would adversely impact the public interest by again referencing the fact that the tower would aid residents in making 911 emergency calls via cellular devices.[24]

The Board then heard from Ms. Wolforth in support of the special use permit. Ms. Wolforth testified that the proposed tower would be barely visible from her property, and that there is a terrible lack of cell phone reception in her area. She also opined that it was a good trade off to obtain cell phone service in exchange for having to look at a few telecommunications towers.

The first member of the public to speak in opposition to the proposed tower site was Darlene Wesener. Ms. Wesener stated that she lived very close to the proposed tower site,[25] and that she did not want to have a telecommunications tower in her line of sight. According to Ms. Wesener, no matter where the tower was located on the Gregg Property, she would be forced to look at it. She also opined that the tower was not necessary because another tower already existed on County Road 475 approximately four miles away "that's been blocking my sunsets now for the last six or seven years, . . . it's near the city

---

[24]At the conclusion of Ms. Westine's presentation, the Board inquired as to how far apart telecommunications towers must be placed in order to have continuous coverage. Ms. Westine responded that the distance between towers is generally one and one-half to two miles, depending on the number of callers in the area and the general terrain. Apparently the Board member who asked this question was concerned whether the tower would provide coverage to a residential development approximately eight miles away.

[25]While Ms. Wesener's residential address was not provided, it can be presumed that she lived more than 500 feet from the tower site because she did not receive notice of the Board's hearing, and Marion County requires that all persons who reside within 500 feet of an affected area must be given written notice in advance.

limits."[26]   Ms. Wesener then stated that the tower on County Road 475 had collocation abilities and that telecommunications towers should not be located closer than eight miles from each other.   Ms. Wesener did not provide any evidence to support her opinions or generalizations concerning the need and/or appearance of Vertex's proposed tower.

Ms. Wesener next asked Ms. Westine whether the proposed tower would have lights.  In response, Ms. Westine confirmed that the tower would not have any lights on it at all, and that the FAA was not requiring that the tower be lit.   Undeterred in her opposition, Ms. Wesener then testified that telecommunications towers kill millions of migratory birds every year and that the proposed Vertex tower would be located very near the Cross Florida Greenway, a "strategic habitat."   Again, Ms. Wesener provided no authority or evidence to support this contention, nor did she provide any evidence to support her theory that an "ugly cell tower" would contribute to global warming, the disappearance of wildlife, potential flooding in Marion County, or would jeopardize the environment in general.   Ms. Wesener concluded her testimony by suggesting that telecommunication towers should be built in "super steeples" on top of churches.[27]

The Board next heard from David Squier, who resides at 6495 SW 66th Street. Although Mr. Squier preferred not to have another telecommunications tower, he requested that any proposed tower not have any blinking strobe lights attached to it.

---

[26]See Hearing Transcript, p. 17; Doc. 13, Exhibit C.

[27]Id., pp. 18-20.

Mr. Reese spoke next, expressing the same concerns and objections to the proposed tower that he testified to at the Commission hearing. Specifically, he would have to drive by the tower every single day and did not want his view impaired by a telecommunications tower. He also disputed the evidence that cell phone reception was poor in his area - he has never had a dropped call. Mr. Reese also testified that none of the approximately 400 farms in Marion County insured by his company have any telecommunications towers on them.

Mr. Reese next addressed Vertex's offer to relocate the tower's access road to SW 80th Street. While this would alleviate any concerns about damage to the lime stone road, Mr. Reese testified that the he would still have to look at the telecommunications tower every single day. Mr. Reese then submitted photos to the Board of other existing tower sites in Marion County in an attempt to convince the Board that Vertex's proposed tower would not be "a beautiful looking tower" but would rather be "nasty looking" and an "eyesore." Mr. Reese understood placing telecommunications towers in commercial areas, but did not understand why a tower should be placed on an agricultural area where, in his opinion, there was no gap in cell phone coverage.[28]

Mr. Reese then testified that he believed several other farm owners in the areas surrounding the Gregg Property would be opposed to the Vertex tower but were not notified

---

[28]Id., pp. 21-23.

of the hearing.[29]  Mr. Reese provided the Board with a power of attorney form from Alex Strubling, a property owner who gave Mr. Reese authority to express her opposition to the proposed tower; and testified that another property owner, Teresa Blayton, was opposed to the tower site, and that Vergery Brown was "deathly afraid" that the tower would collapse onto her home.  Mr. Reese further stated that all of the persons he had spoken to did not have problems with their cell phone coverage and were opposed to the tower.  As with his presentation before the Commission, Mr. Reese did not provide any evidence to support his opinions.[30]

The Board then heard from Randy Klein, who spoke on behalf of Good Shepard Methodist Church, located just southeast of the proposed tower site.  Mr. Klein began by stating that the Church had previously rejected an offer by another company to place a telecommunications tower on its property "in consideration of our neighbors."  He further testified that it was not fair that the proposed Vertex tower would impact neighbors much more than the property owners; that there would eventually be more homes on some of the neighboring land; and that he did not believe another tower was needed.  Mr. Klein's testimony was purely anecdotal and based on his own experiences, he did not provide any documentary or other evidence to support his position.

---

[29]The record evidence before the Court establishes that only persons who lived with 500 feet of the proposed tower site were given written notice about the Board hearing, in accordance with Marion County Code requirements.

[30]See Doc. 13, Exhibit C, pp. 23-25.

22

The Board next heard from Teresa Blayton, who resides at 1051 SW 87th Place. She testified that she would hate to see the beauty of the surrounding area "ruined" by the proposed tower.  Another property owner, David Fisher, then spoke briefly.  Mr. Fisher resides at 810 SW 80th Street and testified that he did not see any benefit to any of the neighboring property owners by placing a telecommunications tower on the Gregg Property.  He also opined that the tower would not be in the best interest of the surrounding area.

The final witness who spoke before the Board in opposition of the proposed tower was Ms. Reese, Gordon Reese's wife.[31]  Ms. Reese testified that she and her husband want to preserve the beauty of the property and surrounding areas and that a tower would be an eye sore.  She further testified that the tower would obstruct her view from her home, and would be a "lightning attraction rod."

The Board then gave Ms. Westine an opportunity for rebuttal.  She began by expressing the sentiment that while everyone wants cell phone service and will call and complain when a call does not go through, no one wants a tower in their backyard.  Ms. Westine then rebutted each of the claims by the opposition witnesses.  With respect to placing a tower inside a church steeple, Ms. Westine explained that such a tower would only permit one antenna instead of the six proposed by the Vertex tower, and that other carriers would eventually come before the Board asking for permission to construct their

---

[31]The record does not divulge Ms. Reese's first name.

23

own towers in the area.  Ms. Westine also pointed out that the photos of other tower sites submitted by Mr Reese were surrounded by chain link fences and did not have any existing vegetation, whereas the proposed Vertex tower would be surrounded by a wood fence and dense vegetation, including a 25 foot vegetative border.  Ms. Westine then disputed Ms. Wesener's contention that millions of migratory birds are killed by towers each year, and explained that past problems with migratory patters were the result of large guide towers. The proposed Vertex tower, however, is a monopole tower with no guides.  Ms. Westine then reminded the Board that the proposed tower site complied with all of the Code's setback requirements, as well as lighting and camouflage, and that the Code itself recognizes that telecommunications towers are necessary to provide cell phone coverage.

The Board then heard from Jim Campbell, T-Mobile's radio frequency engineer, who explained that telecommunications towers are only usable for a maximum distance of up to two and  one-half to three miles.  Locating a tower four to eight miles away as some opponents suggested would not solve the coverage gap in this area.

Ms. Westine next gave a brief conclusion in which she proposed building the Vertex tower so that it resembled a flag pole with the wireless antennas placed inside the tower. Such a structure - known as a "uni-pole" design, would be even less visually obtrusive, would still be able to handle six different antennas, but would have to be lighted to comply with federal law.  Although Ms. Westine was not advocating one tower format over another, she explained that Vertex would be willing to construct a uni-pole if it would make a difference in the Board's decision.

At the conclusion of Ms. Westine's rebuttal, the Board closed the floor to public debate and asked a few questions.  First, Board Member Stone inquired whether Vertex had any other towers in Marion County.  Alan Ruiz, Vertex President, testified that there were no Vertex towers in Marion County; the nearest tower was in Alachua County just west of I-75 on Newberry Road.  Board Member Fitos next asked Ms. Westine to point out on the submitted coverage maps where other non-Vertex telecommunications towers were presently located and where the proposed site on the Gregg Property was located in relation to the other towers.[32]

Following the rebuttal testimony, the Board closed the floor to public debate.  Board Member Kesselring moved to adopt the Planning Department's recommendation and deny Vertex's application.  Board Member Fitos seconded, and the motion passed unanimously.  That same day, the Board enacted Resolution No. 07-R-371, denying Vertex's application for a special use permit for the Gregg Property.[33]  In the written Resolution, the Board agreed with the recommendation of the Planning Department, disagreed with the recommendation of the Zoning Commission, and adopted the following findings of fact:

> 1.    The proposed Special Use at the proposed location is not compatible with the general character of the area, is not consistent with the Marion County Comprehensive Plan and will adversely affect the public interest.

---

[32]The coverage maps indicate that at least nine other towers are located within several miles of the proposed site, but that none are within two miles of the proposed site.  The maps also show a very large area of no coverage.

[33]See Doc. 13, Exhibit F.

2.      Section 5.9.1.  Telecommunications Towers and Antennas, Marion County Land Development Code, provides the applicant for a special use permit for a telecommunications tower shall have the burden of demonstrating that the proposed placement of the telecommunications tower is to the extent possible consistent with the preservation of the aesthetics of the community.

3.      Section 5.9.5 of the Code provides the Board is under no obligation to approve a Special Use Permit application for a telecommunication tower unless and until the applicant meets their burden of demonstrating that the proposed use will not adversely affect the public interest, the proposed use is consistent with the Comprehensive Plan and the proposed use is compatible with land uses in the surrounding area.

4.      Applicant has failed to present substantial competent evidence of a functional need for the tower.

5.      The Board has received public opposition to the proposed use for the following reasons: the tower will be the tallest structure in the area, the tower will affect the aesthetic value of the surrounding area, the tower will be a commercial intrusion in a residential and agricultural area, the tower is too close to improved property, and the tower is too close to a designated scenic road.

6.      The Board has received substantial competent evidence that the proposed use is an incompatible commercial intrusion into a viable agricultural and residential community with prime and locally important farming in the area.

7.      The proposed tower is a 180 foot monopole telecommunications tower without camouflage to assist with mitigating the overall aesthetic impact of the tower.

8.      The applicant has not met its burden of demonstrating that the proposed use is compatible with the surrounding land uses.

9.      The applicant has not met its burden of demonstrating that the proposed use will not adversely affect the public interest.

10.  The applicant has not demonstrated that its proposed use is consistent with Comprehensive Plan Future Land Use Element Policies 3.10 and 3.12 designating rural lands for continued agricultural and silviculture activities.

## **Procedural History**

Vertex filed this action on September 20, 2007, within the 30 day limit set forth by 47 U.S.C. § 332(c)(7)(B)(v).  Count I seeks a declaratory judgment from the Court finding that the County's denial of Vertex's application for a special use permit was without substantial evidence contained in a written record in violation of 47 U.S.C. § 332(c)(7)(B)(iii).  Count II is Vertex's request for permanent injunctive relief in the form of a mandate directing Marion County to issue the special use permit to Vertex.

To date, neither party has requested an expedited hearing, see 47 U.S.C. § 332(c)(7)(B)(v).  Instead, the parties requested a referral to mediation, which was ultimately unsuccessful.  The parties also notified the Court that this case would be resolved on the basis of motions and cross-motions for summary judgment and the record before the County at the time it denied Vertex's application; no discovery would be necessary or appropriate.  (Doc. 6).

Vertex filed its motion for summary judgment on January 28, 2008 along with a copy of the Appendix, which both Parties agree is comprised of all materials considered by the Board in reaching its decision.  On February 13, 2008 the United States Magistrate Judge held a preliminary pretrial conference, during which the Magistrate Judge granted Marion County an extension of time until March 7, 2008 to file its response to Vertex's motion for

summary judgment as well as to file any cross-motion for summary judgment it wished the Court to consider.  Marion County has not moved for summary judgment, but it did file a timely response to Vertex's motion on March 7, 2008, along with several documents it wishes the Court to consider as part of the written record.  This case is therefore now ripe for resolution and the Court will address the merits of Vertex's motion.

### Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other

admissible evidence to demonstrate that a material fact issue remains to be tried.  Celetex, 477 U.S. at 324.

## Discussion

I.    The Telecommunications Act

Congress enacted the Telecommunications Act to "promote competition and higher quality in American telecommunications services and 'to encourage the rapid development of new telecommunications technologies.'" Michael Linet, Inc. v. Village of Wellington, Florida, 408 F.3d 757, (11th Cir. 2005) (quoting City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 115 (2005)).  In furtherance of this purpose, Congress placed certain substantive and procedural limitations upon the authority of local bodies to regulate and limit the construction of facilities for wireless communication services.  For purposes of this case, these limitations include a procedural requirement that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).  According to this provision, governing bodies must produce a written decision, as well as a written record of all the evidence before the governing body at the time the decision was made.  See OPM-USA-Inc v. County of Marion, Florida, No. 97-290-CIV-OC-10B, 1999 WL 1427699, * 11 (M. D. Fla. Sept. 30, 1999); Virginia Metronet, Inc. v. Board of Supervisors of James City County, 984 F.Supp. 966, 972 (E.D.Va.1998) (citing AT & T Wireless PCS, Inc. v. City

Council of the City of Virginia Beach, 979 F.Supp. 416, 428 (E.D.Va.1997)).   Congress established this procedural requirement to ensure the creation of a proper record in order to allow a reviewing court to weigh the specific rationale for the denial and determine if that rationale comports with the Act's provisions.   OPM-USA, Inc., 1999 WL 1427699 at * 11.

II.     Marion County's Decision Was Not Based on Substantial Evidence

Vertex has not sought summary judgment on the grounds that the Board's Resolution No. 07-R-371 is not a "written decision" as required by § 332(c)(7)(B)(iii) of the Telecommunications Act, and the Court concludes that the Resolution would satisfy this requirement in any event.   See OPM-USA-Inc., 1999 WL 1427699 at * 11-12.   The Court will therefore limit its analysis to the second requirement of § 332(c)(7)(B)(iii) - whether the Board's Resolution was supported by substantial evidence contained in the written record.

Although the statute itself does not expressly define "substantial evidence," it is clear from the legislative history of the Act that the phrase "substantial evidence contained in a written record"is the "traditional standard used for judicial review of agency actions," and should be interpreted in the same manner.   H.R. Conf. No. 104-458, 104th Congress, 2d Sess. 208 (1996). See also Preferred Sites, LLC v. Troup County, 296 F.3d 1210, 1218 (11th Cir. 2002); American Tower LP v. City of Huntsville, 295 F.3d 1203, 1207 (11th Cir. 2002).   The Eleventh Circuit has defined the "substantial evidence" standard as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   Am. Tower, 295 F.3d at 1207.   Although the standard "is not as stringent as the preponderance of the evidence standard, it requires courts to take a harder look than

30

when reviewing under the arbitrary and capricious standard."  <u>Preferred Sites, LLC</u>, 296

F.3d at 1218.  "It requires more than a mere scintilla but less than a preponderance."  <u>Am.</u>

<u>Tower</u>, 295 F.3d at 1207 (internal citation omitted).[34]

Under the Act's "substantial evidence" standard, the party seeking to overturn the

governing body's decision has the burden of proving that the decision is not supported by

substantial evidence.  <u>Id.</u> at 1207-08.  In reaching its decision, the Court will view the

record in its entirety, including evidence both favorable and unfavorable to the state or local

government's decision.  <u>Preferred Sites, LLC</u>, 296 F.3d at 1218.  However, the Court is not

free to substitute its judgment for that of governing body,  even if the Court disagrees with

the decision or the evidence could result in two different conclusions.  The Court can only

overturn the decision if it is not supported by substantial evidence.  <u>Id.</u> at 1218-19.  <u>See</u>

<u>also</u> <u>T-Mobile South LLC v. City of Jacksonville, Florida</u>, No. 3:06-cv-846-J-16TEM, 2008

WL 2313154, * 7 (M.D. Fla. June 3, 2008).

The Court also cannot uphold a decision on grounds that were not presented in

writing, and cannot consider evidence that was not before the governing body at the time

the decision was reached.[35]  Moreover, "because [the Act] preserves 'the authority of . . .

---

[34]<u>See also</u> <u>Penobscot Air. Servs. v. FAA</u>, 164 F.3d 713, 718 (1st Cir. 1999) (the "substantial evidence" standard gives the local authority the "benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree that could satisfy a reasonable fact finder.") (internal citation omitted).

[35]In support of its opposition to Vertex's motion for summary judgment, Marion County has submitted several documents which undisputedly were not part of the written record before the Board at the time Vertex's special use permit was denied.  This includes the Affidavits of Darlene
(continued...)

local government . . . over the placement . . . of personal wireless facilities,' the issue becomes whether the Board's decision is sustainable under state law with the extra procedural requirements of the Telecommunications Act."   OPM-USA-Inc., 1999 WL 1427699 at * 12 (internal citation omitted).

Based on the record evidence submitted, the Court concludes that the Board did not reach its decision based on substantial evidence in a written record.  To the contrary, several of the findings are supported by no evidence whatsoever, while others are supported merely by the generalized concerns and unsubstantiated lay opinions from members of the public who oppose any new telecommunications towers in the surrounding areas.   In contrast, Vertex provided the Board with overwhelming competent and substantial evidence demonstrating how the proposed tower site complied with all Code requirements, would be compatible with the surrounding areas, and would not adversely impact the environment.

The Board's Resolution consists of "Findings of Fact" which are broken down into ten enumerated paragraphs.  Three of the paragraphs (1-3) do not set forth any true

---

[35](...continued)
Wessner and Dwight Ganoe, both of which are dated and signed on March 4, 2008, as well as documents relating to the approval of another telecommunications tower on February 19, 2008. None of these documents were in existence at the time the Commission reached its decision in this case, and therefore cannot be considered for purposes of resolving Vertex's motion.  Marion County has also submitted documents relating to a "Greenway Study" conducted between 2005 and 2007; however these documents cannot be considered because there is no evidence (and Marion County does not even suggest) that the Study was ever considered during Vertex's application process.  Accordingly, the Court will ignore these documents for purposes of resolving Vertex's motion for summary judgment.  See Preferred Sites, LLC, 296 F.3d at 1220.

"findings" but merely restate the standards and requirements that must be met in order to obtain a special use permit for a telecommunications tower, and generally state that Vertex did not meet those requirements without explanation.   The other seven paragraphs discussed below provide the Board's reasons for denying Vertex's application.

In paragraph four of the Resolution, the Board found that Vertex failed to present substantial competent evidence of a functional need for a telecommunications tower. Based on the record before the Court, this finding is simply incorrect.  Vertex presented evidence in the form of T-Mobile coverage maps, Marion County tower maps, as well as testimony from T-Mobile's radio frequency engineer, establishing that there was a gap in T-Mobile service coverage in the area of the proposed tower site, that there were no other towers in the vicinity that could provide coverage, and that the proposed tower would aid in closing that gap.  In addition, two members of the public - Ms. Wolforth and Mr. Klein - testified that additional cell phone coverage was needed in the area.

No one provided any substantial competent evidence to refute Vertex's technical showing.   In fact, the Planning Department did not even address this point in its recommendation.  Because the Board did not further explain itself on this point, the Court must presume that the Board was influenced by the lay opinions of other members of the public who spoke in opposition to Vertex's application, specifically Mr. Reese and Ms. Wesener.  While the Court is mindful not to substitute its own judgment for that of the Board, it cannot say that the unsubstantiated opinions of two neighbors with no experience in the telecommunications field can constitute substantial evidence, particularly when

33

measured against the undisputed documentary and expert witness evidence provided by Vertex.[36]

In paragraph five of its findings of fact, the Board stated that it had received public opposition to the proposed tower site because: (1) the tower will be the tallest structure in the area; (2) the tower will affect the aesthetic value of the surrounding area; (3) the tower will be a commercial intrusion in a residential and agricultural area; (4) the tower is too close to improved property; and (5) the tower is too close to a designated scenic road.  To be sure, the Board did hear from several members of the public who were opposed to a telecommunications tower on the Gregg Property, and the bulk of the objections were on aesthetic grounds.[37]  However, the Court finds that this public testimony was nothing more than purely subjective concerns as opposed to articulated, fact based reasons keyed to any of the objective requirements (or limitations) of the County Code.  Each of the witnesses who opposed the proposed tower merely raised concerns that the tower would be an

---

[36]The Court might have been somewhat more persuaded if any of the members of the public who testified that there was no need for the tower were existing T-Mobile customers.

[37]The Court will not address the Board's statement that the tower would be the tallest structure in the area because, while no witness may have actually made such a statement, it cannot be reasonably disputed that a 180 foot tower would be the tallest structure in an agricultural area.  However this individual finding is of no impact as the Court has not found any requirement in the Code or anywhere else which would preclude the granting of a special use permit based solely on the fact that the tower would be the tallest structure around.  For the same reasons, the Court also will not separately discuss the statement about the tower as a commercial intrusion into a residential and agricultural area - no one made such an express statement.  Compatibility issues are discussed later in this Order.

eyesore, and would ruin the beauty of the surrounding areas.[38]  The Court does not doubt

the sincerity of the neighbors' concerns, however this opinion based testimony lacked

sufficient factual content to support the Board's decision.[39]  See Michael Linet, Inc. v.

Village of Wellington, Florida, 408 F.3d 757, 761-62 (11th Cir. 2005) ("A blanket aesthetic

objection does not constitute substantial evidence under § 332 . . . .  Aesthetic objections

coupled with evidence of an adverse impact on property values or safety concerns can

constitute substantial evidence.").  See also Preferred Sites, LLC, 296 F.3d at 1219 (board

decision is not supported by substantial evidence where only opposition evidence were five

petitions signed by 58 citizens); Benjamina Nursery Farm, Inc., 170 F. Supp. 2d 1246, 1253

(S. D. Fla. 2001) (largely opinion based neighbor testimony cannot support board's

decision to deny permit); BellSouth Mobility, Inc. v. Gwinnett County, 944 F. Supp. 923,

926 (N.D. Ga. 1996) (holding that board's denial of zoning permit to construct monopole

tower was not supported by substantial evidence where only record evidence in opposition

were generalized concerns that children would try to climb the tower, that the tower would

collapse in a storm, and that homeowners could see the proposed site from their front

_____

[38]For example, several of the neighbors testified that their views of the surrounding lands and of the sky would be ruined if the tower was built.  However, no one who opposed the tower gave any details as to how much of the tower would be visible from their vantage points.  Rather, the only witness who gave any fact-based testimony on this point was Ms. Wolforth, who testified that she watched Vertex conduct its photo simulation testing and that only a very small portion of the tower would be visible from her home.

[39]The Court recognizes that Mr. Reese's testimony concerning the harm to the lime stone access road would be considered more than mere opinion testimony based on generalized concerns.  However, given that Vertex represented to the Board that it will no longer use the lime stone access road, the Court cannot consider this concern to be substantial evidence.

windows); AT&T Wireless PCS, Inc. v. City of Chamblee, 10 F. Supp.2d 1326, 1331-34

(N.D. Ga. 1997) (holding that denial of application for 140 foot tower was not supported by

substantial evidence where generalized concerns of a few citizens that the tower would

interfere with helicopter traffic were speculative).[40]

The Eleventh Circuit has held that "[a]esthetic concerns may be a valid basis for

denial of a permit *if* substantial evidence of the visual impact of the tower is before the

---

[40]The Court is aware that several other courts in this Circuit - including this Court - have upheld denials of special use permits based in large part on the testimony of neighboring residents. However, in each of those cases, the residential testimony was supported by verifiable and specific facts as well as other evidence. See, e.g., American Tower, 295 F.3d 1208 (board decision was supported by testimony from a realtor and investor in real estate who testified as to the negative effects the proposed tower would have on the area and already had on potential buyers, as well as testimony about safety concerns were tower would be located near facilities used by children); T-Mobile South LLC v. City of Jacksonville, Florida, No. 3:06-cv-846-J-16TEM, 2008 WL 2313154, **10-11 (M.D. Fla. June 3, 2008) (substantial evidence existed to support city's denial of application to construct cell phone tower where evidence included testimony that proposed tree buffer was being cut down and the area near the proposed site was experiencing significant residential growth); Michael Linet, Inc. v. Village of Wellington, No. 03-80856-CIV; 2004 WL 5565012 (S.D. Fla. April 27, 2004), aff'd 408 F.3d 757 (11th Cir. 2005) (board decision was supported by testimony from residents - including a realtor - concerning the cell site's negative impact on real estate values; that the proposed site was unnecessarily close to a middle school and local airplane community; that residents would not have bought their homes if the tower was present at the time of purchase; that residents who viewed the cell provider's photo simulation testing would be able to see large portions of the tower from their homes; and the telecommunications provider failed to show that an alternative location was unavailable or unfeasible); BellSouth Mobility, Inc. v. Miami-Dade County, 153 F. Supp. 2d 1345 (S.D. Fla. 2001) (board decision supported by substantial evidence where residents testified that tower would be aesthetically displeasing based in part on the cumulative impact of the numerous other light and utility poles already in the surrounding area, and that the pole would be a detriment to already declining property values). No such detailed and verifiable facts exist in this case; OPM-USA-Inc., 1999 WL 1427699, * 13 (Court need not determine whether local concerns of residents would suffice, in and of themselves, where board's decision also stands on determination that collocation on existing towers was feasible);AT&T Wireless Services of Florida, Inc. v. Orange County, Florida, 23 F. Supp.2d 1355 (M.D. Fla. 1998) (upholding board decision where proposed tower also would not comply with county setback requirements).

board."  Preferred Sites, LLC, 296 F.3d at 1219 (emphasis in original).   In this case,

however, there is no such substantial evidence.  No one testified as to how much of the

tower would be visible from their respective home sites other than Ms. Wolforth, who

personally witnessed the photo simulations and confirmed that the tower would be barely

visible.  Moreover, to the extent that the Board is relying on the comments of Mr. Reese

and Ms. Wesener that the tower would be too close to their property lines and to County

Road 475, the Court finds that these comments also cannot constitute substantial evidence

because proximity concerns are specifically addressed by the Code's established setback

requirements, and Vertex not only met but exceeded them.   Vertex also presented

substantial and undisputed evidence demonstrating that only the very top of the tower

would be visible from distances between 600 and 800 feet away.  There is no evidence that

the tower would be visible *at all* from the two scenic roads, both of which would be

approximately one-half mile away from the tower site.[41]

Similarly, the Board's findings in paragraph six of the Resolution - that there was

substantial competent evidence that the proposed use was an incompatible commercial

intrusion - also fails.  A review of the record demonstrates that the only evidence submitted

to the Board on this point consists of the Planning Department's recommendation and the

---

[41]The only other testimony concerning aesthetics came from Mr. Reese, who argued that he would have to drive by the base of the tower every day and that other towers are quite unattractive.  In response, Vertex promised to maintain landscaping to screen the base of the tower, including a 25 foot vegetative buffer and wooden fence.  Mr. Reese did not have any commentary to rebut Vertex's representations.

generalized aesthetic concerns from members of the public, which the Court has already determined cannot constitute substantial evidence in this case.  The Planning Department's recommendation also cannot constitute substantial evidence for it has no basis in fact - there is no explanation as to how the Department reached its determination that the proposed tower site would be an incompatible commercial intrusion.   Moreover, the Department's conclusion is directly contradicted by the fact that the Department proposed alternative conditions of approval, with the only measurable change from Vertex's original application being the relocation of the tower site by approximately 90 feet.  Either the tower is an incompatible commercial intrusion or it is not; relocating the tower site by 90 feet to a more central, less camouflaged area on the Gregg Property would not change this result.[42]

On the other hand, Vertex presented substantial competent evidence demonstrating that the proposed tower would be a minor intrusion into the area.  The proposed site would equate to 4800 square feet out of a 27.5 acre single family residence parcel; the tower would have no lighting, would take only a few weeks to build, would have minimal maintenance and traffic requirements, would make no noise, generate no trash or offensive odors, and would not require any water service.  In addition, there was no evidence before

---

[42]It would also appear that Marion County has determined that telecommunications towers are not incompatible with agriculturally-zoned lands.  Otherwise there would be no need for the detailed special use permitting process set forth in Section 5.9 of the Code.

the Board demonstrating, or even suggesting, that the tower would inhibit or prevent any agricultural or farming activities in the area.

The Board's findings in paragraph seven merely state that the proposed tower would be a 180 foot monopole tower with no camouflage to assist with mitigating the overall aesthetic impact of the tower.  Initially, the Court notes that it would be almost impossible to buffer a communications tower so that it is not visible at all, and "[f]ew people would argue that telecommunications towers are aesthetically pleasing." Southwestern Bell Mobile Systems v. Todd, 244 F.3d 51, 61 (1st Cir. 2001).  However, the evidence demonstrates that Vertex is willing to go to great lengths to camouflage its proposed tower from the surrounding properties and, therefore, to assist with mitigating the overall aesthetic impact of the tower.  The photo simulation documents demonstrated that the majority of the tower would be hidden by dense foliage, that the tower would be barely visible from nearby properties, and that the tower would not require any lighting.  Vertex also agreed to provide a 25 foot vegetative buffer and to surround the tower's base with a six foot high wooden fence.  Although Vertex proposed constructing the tower in a monopole design, which is much smaller than the typical lattice design, Vertex also offered to construct the tower as a uni-pole or flag pole design to even further camouflage the tower - an offer the Board ignored.  Thus the substantial evidence before the Board overwhelmingly shows that Vertex was ready, willing and able to mitigate the overall aesthetic impact of the tower, going above and beyond what was required by the Code

39

itself.[43]     The Board's finding states the opposite of the conclusion compelled by the undisputed evidence presented to it.

Paragraph eight of the Board's Resolution suffers the same fate.  The Board states, without any explanation, that Vertex did not meet its burden of demonstrating that the proposed use is compatible with the surrounding land uses.  Thus, the Court is once again left to guess what evidence the Board used to support this finding.  And again, the only evidence submitted that would support such a claim are the subjective and nontechnical opinions and beliefs of the neighboring residents.   Conversely, Vertex did present competent, unrebutted, substantial evidence demonstrating that the proposed tower would be compatible with the surrounding land uses.  The tower would be largely camouflaged by trees, with a 25 foot vegetative buffer and wood fence, with minimal traffic, and no lights.  The location of the tower would also far exceed all setback requirements.  Accordingly, the Court cannot find that the Board's finding in paragraph nine is based on substantial evidence in a written record.

The Board's next finding is set forth in paragraph nine, and states that Vertex did not establish that the proposed tower would not adversely affect the public interest.  Again, there is no explanation given as to how or why the proposed tower would have such an impact, but one could surmise from the record that the Board was concerned about the

---

[43]As Vertex correctly points out, there is no requirement in the Code that a tower be camouflaged, only that, to the extent possible, the tower be consistent with the aesthetics of the surrounding areas.

sheer height of the proposed structure and the likelihood that it would be an eyesore in the surrounding neighborhood.  If so, the natural result would be a diminution of property values; but, if that was the rationale underlying this finding of fact, it is completely unsupported in the written record.  While some members of the public opined generally that property values might decrease,  there was no testimony - anecdotal or otherwise - from anyone with any qualifications or expertise (such as a realtor) to speak on this issue. See Primeco Personal Communications Limited Partnership v. Lake County, Florida, No. 97-208-CIV-OC-10B, 1998 WL 565036, * 9 (M.D. Fla. July 20, 1998) ("unsupported and hypothetical 'potential' for a decrease in property values is insufficient to warrant a denial of [a special use permit] application.").  Similarly, to the extent the Board is relying on the Planning Department's recommendation that the tower site may adversely impact future or potential residential development, not only is such a claim too speculative and vague to constitute substantial evidence, (the recommendation does not even specify how future development would be impacted), but there was no evidence presented to either the Commission or the Board on this point.  Moreover, the Planning Department's speculative conclusion is directly contradicted by the Department's listing of alternative conditions of approval.

On the other hand, if the Board intended its reference to adverse impact to refer to the potential danger to surrounding areas should the tower collapse or be struck by lightning, this finding is likewise devoid of any supporting record evidence.  Vertex presented unrebutted testimony - including diagrams signed by a Florida Licensed

Engineer showing that the tower would be designed to collapse within a 50 foot fall radius -

certifying that in the event of a failure or catastrophic event, the tower would fall within the

confines of the 4800 square foot site, and would not fall on any neighboring properties.

Vertex also presented unrebutted testimony that the tower would be constructed to absorb

any lightning strikes.   The only evidence presented of any safety concerns were the

unshakeable fears of Ms. Brown that the tower would fall on her house nearly 200 feet

away, and Mr. Reese's belief that the tower would result in lightning damage to surrounding

areas.   Again, these personal and subjective concerns, which directly conflict with

undisputed substantial expert and documentary evidence, cannot be considered valid

safety considerations.[44]   See Group EMF, Inc. v. Coweta County, 50 F. Supp. 2d 1338,

1347-50 (N.D. Ga. 1999) (holding that denial of application for 150 foot monopole tower

was not supported by substantial evidence where safety engineers rebutted resident

concerns that pole would fall on a residential structure, and where safety experts concluded

that the pole would not pose a safety concern with respect to airport traffic).

In contrast, Vertex further established that its proposed tower would not significantly

impact the surrounding areas or the public interest by presenting evidence at the Board's

---

[44]The Court also notes that Ms. Wesener made a litany of claims in opposition to the proposed tower: that the tower would result in the deaths of millions of migratory birds, and that the tower would contribute to global warming, flooding, loss of wildlife, as well as the general destruction of the environment.  Because the Board's Resolution does not explain how it reached its findings, the Court cannot be entirely sure whether or not the Board considered Ms. Wesener's broad and unsupported claims.  Therefore, in the effort to present a fully complete record, the Court is compelled to state that Ms. Wesener's extremist claims do not constitute substantial evidence sufficient to support the Board's denial.

public hearing that the tower would be unmanned, requiring only periodic maintenance and generating minimal traffic in the area. In addition, Vertex testified that the proposed tower would aid the public by addressing a gap in T-Mobile's service, as well as assisting in the completion of 911 emergency calls made on cell phones in the area. The Court concludes, therefore, that the Board's finding that Vertex did not establish that its proposed tower would not adversely impact the public interest is not supported by substantial evidence.

The Court has difficulty even addressing the Board's last finding, that Vertex did not demonstrate that the proposed tower is consistent with the Comprehensive Plan Future Land Use Element Policies 3.10 and 3.12, because there is simply no evidence anywhere in the record on this point.[45] These policies are nowhere discussed or even mentioned until the Resolution, no witness testified about them during the Commission or Board hearings, and Marion County does not explain this finding in its motion papers. In contrast, Vertex

---

[45]Policy 3.10 provides, relevant part that "Non-residential development and land uses, including commercial and industrial uses in the Rural Land, that are functionally related to rural and/or agricultural land uses may be located in the Rural Land by Special Use Permit. Functionally related rural and agricultural uses are those activities and development which occur in connection to farm/agricultural operations and/or provide services related to the production or marketing of agricultural products." See Doc. 19, p. 24. Not only does it appear that this Policy directly conflicts with Sections 4.6 and 5.9 of the Marion County Code, which expressly permit telecommunications towers in agriculturally zoned lands, there is no evidence in the record showing that Vertex's proposed tower would conflict with this Policy. For example, the Policy does not state that telecommunications towers are not permitted on Rural Land.

Policy 3.12 provides that "Agriculture and silviculture activites shall be encouraged to continue at their current levels by designating lands for these activities, minimizing restrictions, promoting continued technological innovation, increasing educational programs and directing urban development activities away from prime agricultural lands and into the Urban Areas, the rural villages and/or hamlets." See Doc. 19, p. 24. There is no evidence in the record anywhere explaining this policy, or how Vertex's proposed tower would conflict with this policy.

presented substantial overwhelming evidence establishing how it has complied with all requirements set forth in the Code, as well as how the impact of the proposed tower on the surrounding areas would be minimal.    In addition, it is undisputed that a telecommunications tower may be located in agricultural areas - otherwise the Code provisions governing the permitting process would be pointless.  Just as the Court cannot substitute its own judgment for that of the Board, the Court cannot, and will not, cull through an extensive record and speculate as to why the Board reached this finding. Consequently, the Court cannot find that the Board had substantial evidence before it on this point.[46]

Because the Court has found that each of the Board's findings are not supported by substantial evidence, the Court concludes that summary judgment in favor of Vertex is appropriate.  The Court fully recognizes that there are many situations where testimony from residents alone would be sufficient to uphold a denial of a special use permit. However, this is not such a case.  There is simply insufficient substantial evidence that a reasonable mind would accept as adequate to support the Board's decision.

As a remedy, Vertex requests both a declaration that the Board's decision was without substantial evidence in a written record, and an injunction directing the Board to issue the special use permit.  Marion County has not suggested that any other form of relief

---

[46]Even if the Court were to attempt such a task, the only evidence would again be conclusory statements by the Planning Department referencing the Comprehensive Plan, and generalized opinions of residents, neither of which constitute substantial evidence based on the facts of this case.

would be more appropriate.   The Court finds that declaratory and injunctive relief is warranted.

## Conclusion

Accordingly, upon due consideration, it is hereby ORDERED AND ADJUDGED as follows:

(1)     The Plaintiff Vertex Development, LLC's Motion for Summary Judgment (Doc. 13) is GRANTED as to both Counts I and II of the Plaintiff's Complaint (Doc. 1);

(2)     The decision of the Marion County Board of Commissioners, memorialized in Resolution No. 07-R-371 dated August 21, 2007, is declared null and void;

(3)     Marion County, by and through its Board of Commissioners, is ordered and enjoined to immediately approve Vertex's application for a special use permit, dated June 13, 2007, with the additional conditions that the access road to the tower site shall be on SW 80th Street, that Vertex shall maintain a 25 foot vegetative buffer around the tower site, and that Vertex shall border the tower site with a wooden fence.

(4)     The Clerk is directed to enter judgment accordingly, terminate any pending motions, and close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 30th day of July, 2008.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record